IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHANNON GOLAT,

　　　　　　　　　　　Plaintiff,

　　　v.

WISCONSIN STATE COURT SYSTEM,                    OPINION and ORDER
CHRISTOPHER CHANNING,
CAITLIN FREDRICK, MELISSA BOHSE,                          23-cv-719-jdp
and STEVEN ANDERSON,

　　　　　　　　　　　Defendants.

---

Plaintiff Shannon Golat worked as a court reporter for defendant Wisconsin State Court System from 2003 until 2022. For the last twelve years of her employment, she was assigned to work for defendant Judge Steven Anderson of the Rusk County Circuit Court. Defendant Christopher Channing is the court administrator for the Tenth Judicial District, which includes Rusk County. Defendants Caitlin Fredrick and Melissa Bohse are human resources employees for the court system.

Golat asserts claims under Title VII, the Rehabilitation Act, and 42 U.S.C. § 1983. She contends that Anderson and other individuals at the courthouse made sexually demeaning comments toward Golat, isolated her in the workplace, and failed to reasonably accommodate her after she injured herself at work. When Golat complained, she says, defendants began a yearslong scheme to retaliate against her, repeatedly accusing her of misconduct as pretext to justify her eventual termination.

Cross-motions for summary judgment are before the court. The court concludes that Golat has not adduced evidence sufficient to create a triable issue on any of her claims. Most of the hostile conduct that Golat says she experienced was not related to her sex, and the

remainder was not so severe or pervasive to create a hostile work environment. As for her Rehabilitation Act claims, Golat has not shown that defendants denied her reasonable accommodations. And as for her retaliation claims, defendants have offered legitimate reasons for each of the adverse employment actions they took against Golat, and no reasonable jury could find that those reasons were pretext for retaliation. Golat's motion for summary judgment will be denied and defendants' motion will be granted.

That leaves two pending discovery motions. Defendants' motion to compel and for sanctions will be denied as moot. Golat has also appealed an order by the magistrate judge denying Golat's motion to compel and awarding attorney fees and costs to defendants under Federal Rule of Civil Procedure 37. Dkt. 197. The court will affirm the magistrate judge's order.

## PRELIMINARY EVIDENTIARY ISSUES

Before recounting the facts, the court begins with a discussion of the summary judgment evidence.  Neither of the parties followed the court's summary judgment procedures, although Golat is the worse offender. Both parties have proposed facts containing more than one, and in many cases many factual assertions, only some of which are supported by the cited evidence. This makes it difficult to determine which facts are genuinely disputed. Further, many of Golat's proposed facts rely solely on hearsay evidence or on affidavits from witnesses that fail to explain how they have personal knowledge of these events. Golat has also responded to many of defendants' proposed facts with additional unresponsive assertions and without including citations to supporting evidence. The court will disregard factual assertions made without citations to admissible supporting evidence and will treat as undisputed any facts

where the response does not either identify contradictory evidence or state that the proposed fact is unsupported by admissible evidence.

UNDISPUTED FACTS

The parties submitted more than 700 proposed facts, which cover events spanning more than a decade and involving an extensive cast of characters. The following is an overview of the facts; additional details will be presented as they become relevant to the analysis. These facts are undisputed except where noted.

Shannon Golat began working as a court reporter for the Wisconsin State Court System in 2003. She worked in Rusk County Circuit Court. In 2010, Judge Steven Anderson appointed Golat to be his court reporter.

## A. Harassment allegations

Golat alleges that during her time working as his court reporter, Anderson sexually harassed her and made disparaging comments about women in her presence. Golat also says that courthouse staff and visitors made rude comments about her body, sometimes in Anderson's presence. Anderson mostly denies these allegations.

In 2017, Anderson hired a new judicial assistant, Sharon Lee, who did not get along with Golat. Lee stopped sharing Anderson's calendar with Golat, stopped giving Golat her mail, removed Golat's name from the courthouse letterhead, and did not invite Golat to social events. Golat complained about Lee's behavior to defendant Caitlin Frederick, a human resources officer, and to Don Harper, the judicial district administrator. Frederick and Harper suggested solutions to separate Golat and Lee, though Golat felt that the proposed solutions rewarded

Lee's bad behavior. The conflict with Lee soured Golat's relationship with Anderson, who was friendly with Lee.

## B. Injury and medical leave

In November 2018, Golat injured her elbow after falling at work. For several months, she was medically restricted to working no more than two hours per day. Golat fell behind on completing transcripts during this period, leading several attorneys to complain to court system leadership that they had not received transcripts from her.

Around the same time as Golat's injury, the courthouse implemented a digital audio recording (DAR) system to record hearings when there was no court reporter available for real-time reporting. Golat didn't like using the DAR system; she viewed DAR transcription as a demotion, and she believed it created extra work because it took longer to produce transcripts from DAR recordings. The court sometimes used the DAR system when Golat was medically restricted from typing. Golat complained to Harper that this practice increased her workload because she was responsible for producing transcripts for DAR-recorded hearings, which she would not have been responsible for if a live court reporter had filled in for her.

In May 2019, Golat had elbow surgery and was on medical leave for most of the summer. While Golat was on leave, court system leadership, including Anderson, Frederick, Tenth Judicial District chief judge Maureen Boyle, and interim district court administrator Greg Moore (who had recently replaced Harper) discussed whether to terminate Golat. Notes from their conversations show that they discussed Golat's medical restrictions and whether Golat had faked her injury to get workers compensation. Dkt. 94-31 and Dkt. 94-33. They also discussed Golat's reputation for being "nasty, rude, and mean," her unsatisfactory work

product, and her refusal at times to complete DAR transcripts. *Id.* They ultimately decided not terminate Golat and instead to "let the situation play out a little longer." Dkt. 94-62.

Golat returned from medical leave in August 2019. Shortly after her return, Moore was replaced by defendant Christopher Channing as district court administrator.

Golat's working relationship with courthouse leadership deteriorated in the months following her return from medical leave. Golat continued to complain about the DAR system. She also missed some transcript deadlines. At one point, Golat requested help from a floating court reporter to catch up. Channing denied the request, noting that Golat had requested help with DAR transcripts only, so the request "appears to be done to not fulfill any transcripts that had been recorded and monitoring using the dar system." Dkt. 127-1, at 70.

During this time, Anderson told Golat that she needed to take a full day of sick leave if she needed time off for medical appointments. Anderson also decided to move Golat's office, telling her that the courthouse needed her previous office for a conference room. Golat complained about these issues to Channing and Frederick; she also raised the issue of Anderson's sexual harassment and offensive comments about women. Frederick opened an HR investigation into Anderson, which was eventually closed for insufficient evidence.

## C. Discipline

In the two years after she complained about Anderson, court system leadership investigated Golat multiple times for work-related problems. In 2020 and 2021, Channing reprimanded Golat twice for failing to complete transcripts on time. In late 2020, he reprimanded her for submitting excessive travel reimbursement requests, though he dropped the reprimand after realizing that he had used the wrong address to calculate Golat's mileage.

In 2021, Channing reprimanded Golat for reporting 43 hours of work on her timesheet without receiving overtime approval. Golat was not formally disciplined for any of these events.

In December 2021, Golat was suspected of stealing a vacuum intended for the district attorney's office. Golat had not stolen the vacuum; she had accepted the delivery and put it in a conference room next to her office, but she had told staff in the district attorney's office conflicting things while they were looking for the vacuum. Staff found the vacuum in the conference room after a few days, but defendant human resources officer Melissa Bohse nevertheless initiated an investigation related to the incident. In March 2022, Bohse formally reprimanded Golat for mishandling court property and lying during the investigation into the missing vacuum. Golat was suspended without pay for one week. Dkt. 128-3.

Around the same time, Golat was also investigated for two other incidents. First, district attorney Annette Barna accused Golat of contacting Frank and Brigette Rosolowski, the family members of the victims in a homicide case before Anderson. According to Barna, Golat had called Bridgette to tell her that she had a recording of Anderson making a negative comment about Frank. After court staff escalated the issue to Anderson and chief judge Boyle, Anderson eventually decided to recuse himself from the homicide case. For her part, Golat admits to calling Bridgette, but denies offering Bridgette a recording. Golat says that she asked Bridgette to be a witness in her EEOC case against Anderson because Bridgette had heard Anderson call Golat a lesbian during a court hearing.

Second, clerk of court Lori Gorsegner reported to Channing that Golat had provided a transcript to a local salon owner in exchange for salon credit. Gorsegner learned this from a friend who went to the salon. Golat admits that she accepted $210 in salon credit in exchange for transcripts.

Court staff reported both the Rosolowski incident and the salon credit incident to Bohse, who initiated HR investigations. In March 2022, when her suspension for the vacuum incident ended, Bohse placed Golat on paid administrative leave while the investigations continued. Bohse eventually determined that Golat had violated court system rules by creating a conflict of interest and by soliciting gifts in exchange for court-related duties. She was issued a written reprimand on July 29, 2022. Dkt. 94-21.

## D. Termination

On July 29, the same day that Golat was formally reprimanded for the Rosolowski incident and the salon credits incident, Anderson retired. He was replaced by former district attorney Annette Barna. Court reporters are personal appointees of specific judges, but when a judge retires, his replacement often hires the same court reporter without a formal application process. Barna decided not to hire Golat. After being denied a position with Barna, Golat applied to be a court reporter for Judge Angeline Winton in Washburn County. But Channing showed Winton Golat's personnel file, including the reprimands she had received for the vacuum incident, the Rosolowski incident, and the salon credits incident. Winton decided not to hire Golat. Golat has not worked as a court reporter since Anderson's retirement.

ANALYSIS

## A. Motions for summary judgment

Golat's claims fall into three categories. First, she asserts hostile work environment claims under Title VII and 42 U.S.C. § 1983, contending that she was harassed because of her sex. Second, she asserts claims under the Rehabilitation Act, contending that defendants failed to provide her with reasonable accommodations for her elbow injury. Third, she asserts Title

VII, Rehabilitation Act, and § 1983 retaliation claims, contending that defendants pursued false investigations, suspended her, and ultimately caused her to lose her job as a court reporter in retaliation for her complaints and accommodation requests.

Both parties have moved for summary judgment. Dkt. 89 and Dkt. 119. The court begins with Golat's hostile work environment claims.

## 1. Hostile work environment

Golat brings a hostile work environment claim under Title VII, contending that defendants sexually harassed and bullied her because of her sex.[1] A Title VII hostile work environment claim has four elements: (1) plaintiff was subject to unwelcome harassment; (2) the harassment was based on her race; (3) "the harassment was so severe or pervasive as to alter the conditions of her employment;" and (4) there is a basis for employer liability. *Equal Emp. Opportunity Comm'n v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 401 (7th Cir. 2024).

Many of the facts relevant to the hostile work environment claim are disputed, which is sufficient reason on its own to deny Golat's motion for summary judgment on this claim. To evaluate defendants' motion, the court presumes Golat's version of the facts to be true.

Before turning to the facts, there are two preliminary issues. First, Golat relies on an affidavit from former deputy courthouse clerk Rhonda Kelley to support some of her hostile work environment claims. Dkt. 94-4. Defendants have moved to strike the Kelley affidavit,

---

[1] In her response brief, Golat also asserts a hostile work environment claim based on disability status. But Golat did not plead any facts in her second amended complaint that would have put defendants on notice of this claim. A plaintiff "may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (internal quotation marks omitted). The court will not consider Golat's arguments that she was subjected to a hostile work environment based on disability status.

contending that Golat failed to produce the affidavit during discovery. Dkt. 120. The court will deny the motion to strike as moot because even considering the affidavit, Golat has not adduced evidence warranting a trial. The court notes, however, that many of the statements in the Kelley affidavit are hearsay or entirely lacking in foundation. E.g., Dkt. 94-4, ¶ 12 ("I heard that Judge Anderson would belittle Shannon in the court room and outside of the courtroom"); ¶ 15 ("I recall Shannon telling me that Judge Anderson said in the courtroom that she was a lesbian because she drove a Subaru."). The court will disregard those statements.

Second, in her EEOC complaint, Golat listed a number of offensive comments that she says Anderson made in her presence, including saying that he had a large penis, saying that he could sleep with anyone in the county, asking to see photos for a specific case because it looked like the woman "had some work done," and commenting about what women were wearing under their jail uniforms when they appeared in his court. Dkt. 94-26. But in her proposed facts, Golat doesn't say that Anderson made any of these comments, nor does she provide any admissible evidence that Anderson said these things. Instead, she proposes as a fact that she put these things in her EEOC complaint. *See* Dkt. 103, ¶ 78. The EEOC complaint is hearsay, so it cannot be used as evidence that Anderson said these things. The court will not consider any of these alleged comments further.

Golat's hostile work environment claim is based on the following events, which she says occurred between 2017 and 2022:

- Anderson joked to Golat on multiple occasions that she must be a lesbian because she drove a Subaru.

- Anderson told Golat that she behaved like a "junior high school girl" and that she was a "typical woman, all you do is nag, nag, nag."

- When Golat complained about Anderson's comments, Anderson asked her if she was going to go back to her office and cry.

9

- Anderson used a mug in the courtroom that was decorated with cartoon imagery of male genitalia and the words "hung jury."

- After Golat returned from jogging over her lunch break, a court security officer told her that he thought she would have "black eyes," referring to her breasts. Anderson was present for this comment.

- An attorney told Golat after a court hearing that he wanted to tell her how fit she was, but that he was worried it would sound "creepy" coming from him. Anderson was present for this comment.

- Anderson's judicial assistant Sharon Lee and other women in the office watched Golat while she was jogging at lunch and commented on her "skimpy outfit."

- Lee made negative comments about Golat's body and her breasts.

- Lee refused to give to Golat the court calendar, stopped delivering her mail, removed her name from the court letterhead, failed to invite her to office-wide events, and put her medical appointments on a public calendar.

- When Golat was injured at work, Anderson told others that he thought Golat was faking her injuries. He also joked about Golat's complaints about Lee in front of other courthouse employees.

- Golat was investigated or disciplined multiple times: for failing to complete transcripts on time, for submitting erroneous mileage reimbursement, for reporting overtime without approval, for allegedly stealing a vacuum, for contacting the victims in a pending case before Anderson, and for accepting salon credits as payment for a transcript.

Defendants contend that these allegations fail to support a hostile work environment claim for two reasons: first, much of this conduct was unrelated to Golat's sex; and second, this conduct was not sufficiently severe or pervasive to support a hostile work environment claim.

To prevail on her hostile work environment claim, Golat must show a causal connection between the harassment and her sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). "A connection between the harassment and the plaintiff's protected class need not be explicit," but "there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining

10

employee belongs to a [protected class]." *Cole v. Bd. of Trs. of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (internal quotations omitted) (emphasis in original). The connection is obvious when a plaintiff is subjected to explicitly discriminatory remarks or conduct, such as sexual harassment or gender-based epithets. But when a plaintiff's claim is based on seemingly neutral forms of harassment, the plaintiff must adduce evidence tying the harassment to her protected class, such as evidence that the perpetrators of the harassment also made discriminatory remarks or evidence that others in the protected class were also treated in a hostile manner. *Id.; see also Hall v. City of Chicago*, 713 F.3d 325, 334 (7th Cir. 2013).

Defendants contend that much of the conduct Golat experienced was unrelated to her sex, particularly the bullying from Sharon Lee and the investigations and discipline Golat experienced. The court agrees. As for Lee, Golat affirmatively states in her response brief that "the animosity between Golat and Lee stemmed from Lee's dislike of Golat's family," which implies that it did not stem from discriminatory animus because of Golat's sex. Dkt. 146, at 8. Golat says that Lee made comments about her body and her breasts, which a reasonable jury could find to have been at least partially motivated by her sex. But given Golat's admission that Lee's primary motivation was non-discriminatory, no reasonable jury could infer that Lee's other conduct (removing Golat from the letterhead, preventing her from accessing her mail and her calendar, and not inviting Golat to office events) was motivated by Golat's sex.

Nor could a reasonable jury find a causal connection between Golat's sex and the investigations and discipline she experienced. Golat's theory of causation appears to be that Anderson, who had demonstrated animus toward women, was involved in the investigations. But that connection is too tenuous to create a genuine dispute on causation, for two reasons. First, although Anderson did play a small role in some of the disciplinary events, the primary

decision-maker in each instance was Channing, Frederick, or Bohse, and Golat doesn't allege that any of them harbored discriminatory animus. Second, Golat admits to many of the rule violations for which was disciplined, and she points to no evidence that male employees who committed similar violations were not disciplined. *See Hudson v. C.P. Rail Sys.*, 24 F. App'x 610 (7th Cir. 2001) (legitimate discipline does not support a hostile work environment claim).

That leaves Anderson's jokes about Golat being a lesbian, his comments that she acted like a "junior high school girl" and a "typical woman," his asking her whether she was going to go back to her office and cry, his use of a mug depicting cartoon male genitalia, and the comments from court staff and visitors about Golat's body, breasts, and "skimpy outfit." Defendants contend that these incidents were insufficiently severe or pervasive to create a hostile work environment.

In determining whether harassment was sufficiently severe or pervasive for a hostile work environment claim, courts look at the totality of the circumstances and consider several factors. See *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). These factors include "the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Anderson v. Mott Street*, 104 F.4th 646, 652 (7th Cir. 2024) (citation omitted). The key question is whether the conduct was so severe or pervasive that it created an abusive working environment. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Summary judgment is proper when no reasonable jury could find that the conduct was severe or pervasive. *Cf. Johnson v. Advoc. Health and Hosp. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).

In total, Golat has identified fewer than ten incidents of sexist comments over the course of five years. The Seventh Circuit has repeatedly held that conduct more egregious than what Golat experienced was not severe or pervasive harassment. *See, e.g., Scruggs*, 587 F.3d at 841 (holding that conduct was not severe or pervasive even though supervisor told the plaintiff that she was "made for the back seat of a car;" that she looked like a "dyke;" and that he hated "pushy, aggressive women" like her); *Anderson*, 104 F.4th at 652 (same even though coworker touched the plaintiff inappropriately three or four times, another coworker called her a "bitch;" and the manager directed her to wear tight, form-fitting clothing); *Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749 (7th Cir. 2002) (same even though supervisor made eight gender-related comments, including that "the only valuable thing to a woman is that she has breasts and a vagina"). In each of these cases, the Seventh Circuit held that the conduct was offensive but also sporadic, not physically threatening, and not enough to create an abusive working environment.

The same result follows in this case. The comments Golat says that Anderson and others made were rude and unprofessional. But they occurred only sporadically and were not accompanied by any touching or other physically threatening behavior. No reasonable jury could find this behavior objectively severe or pervasive, so defendants are entitled to summary judgment on Golat's hostile work environment claim.

## 2. Reasonable accommodation

Golat asserts claims under the Rehabilitation Act for failure to reasonably accommodate her elbow injury. A failure to accommodate claim has three elements: (1) the plaintiff is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the

employer failed to reasonably accommodate the disability. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).[2] Only the third element is disputed.

A reasonable accommodation means those measures that enable a disabled employee to perform the essential functions of her job. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476 (7th Cir. 2017). "An employer is not obligated to provide an employee the accommodation she requests or prefers; the employer need only provide some reasonable accommodation." *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 681 (7th Cir. 2010) (quoting *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008)). An employee bears the initial burden of showing that the accommodations she was denied were facially reasonable. *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014).

Golat says that defendants failed to accommodate her in five different ways: first, they moved her office; second, they made comments saying that she couldn't do her job because of her disability; third, they forced her to transcribe from the DAR system instead of assigning her to in-court reporting; fourth, they made her take a full day of sick leave when she had medical appointments; and fifth, they told her that she couldn't ask for transcript help from floating court reporters.

The first and second reasons are unrelated to her reasonable accommodation claim. A reasonable accommodation is a measure that enables a disabled employee to perform the essential functions of her job. *Severson*, 872 F.3d at 481. Golat may not have liked having her office moved, but she doesn't say that she needed her previous office to perform the essential

---

[2]*Bunn* involved a claim under the Americans with Disabilities Act (ADA), not the Rehabilitation Act. But as both parties acknowledge in their briefs, the legal standard for a failure to accommodate claim is the same under both statutes, so ADA case law applies equally to Rehabilitation Act claims. *Smithson v. Austin*, 86 F.4th 815, 820 (7th Cir. 2023)

functions of her job despite her disability. And the comments that court staff made about Golat's disability are irrelevant; what matters in a reasonable accommodation claim is not what the defendants said about Golat's disability, but what steps they took to allow her to perform the essential functions of her job.

The third and fourth reasons also fail to support a reasonable accommodation claim. Golat says that the defendants kept her out of the courtroom and forced her to become mostly a DAR reporter, which she viewed as an effective demotion. But in her own brief, Golat admits that the DAR system was an accommodation. Dkt. 104, at 79. Golat had medical restrictions on the amount of time she could type in a day, so the DAR system allowed the court to continue functioning even when Golat could not take the record in real time. Golat fails to identify any reason why DAR was not a reasonable accommodation other than that she did not like using it. But disabled employees are not entitled to their preferred accommodations, only to some reasonable accommodation. *Gratzl*, 601 F.3d at 681.

As for the requirement that Golat take full days of sick leave if she needed to attend medical appointments, Golat says that defendants should have given her a flexible schedule to attend medical appointments instead of requiring her to use full days of paid leave. But employers can place reasonable restrictions on a disabled employee's use of leave to attend medical appointments. *Yochim v. Carson*, 935 F.3d 586, 593 (7th Cir. 2019). Defendants say that they required Golat to take a full day of leave because it was easier to find a substitute court reporter for a whole day as opposed to just a few hours. Dkt. 158, ¶ 385. Golat does not substantively dispute this point; her sole argument in response is that defendants had previously allowed her to leave for just a few hours to attend appointments. But an employer does not concede the reasonableness of an accommodation just because it previously went

further than the law requires. *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995); *Severson*, 872 F.3d at 483. Golat bears the initial burden of showing that she was not offered a reasonable accommodation. *Taylor-Novotny*, 772 F.3d at 493. Golat provides no evidence that the defendants' requirement that she take a full day of leave was unreasonable, so she has not met that burden.

That leaves the fifth reason, which is that Channing prohibited her from requesting help from floating court reporters to complete transcripts. But the evidence doesn't support Golat's characterization of Channing's behavior. Golat provided an affidavit from floating court reporter Becky Berhow, who said that she "received an email from the District Court Administrator, Chris Channing, wherein he had me stop helping Shannon. He said that all DAR requests should go through him moving forward." Dkt. 94-56, at 1. Berhow does not say when this happened, but her description of what occurred is consistent with a July 20, 2020, email from Channing to Golat, in which Channing denied Golat's request for help with six transcripts. Dkt. 127-1, at 66. Channing wrote: "[I]t is only Dar transcripts that you are requesting to have covered for these six cases. While I am open to working with reporters when the occasional need arises this request clearly appears to be done to not fulfill any transcripts that had been recorded and monitored using the dar system." *Id.* It is undisputed that Channing did not issue a blanket ban on Golat receiving transcript assistance: the record shows that in November of that same year, Channing granted a request for Berhow to assist Golat with four transcripts. *See id.* at 86–87.

Even construed in the light most favorable to Golat, no reasonable jury could infer from the evidence that Channing prohibited Golat from receiving transcript assistance. The record shows that Channing told Golat only that she could not use requests for assistance to avoid

fulfilling DAR transcripts, and that he denied requests for help when it appeared that Golat was attempting to avoid DAR transcription. It is not a violation of the Rehabilitation Act for a supervisor to insist that an employee with a disability comply with the requirements of her job. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852 (7th Cir. 2005) ("[T]he ADA . . . does [not] protect an employee who is insubordinate and refuses to obey and accept direct orders from his supervisors."). Channing did not violate the Rehabilitation Act by insisting that Golat complete DAR transcripts.

The undisputed evidence shows that defendants accommodated Golat's medical restrictions in several ways, by granting her reduced work schedules, allowing her to use the DAR system during the hours she was restricted from typing, and approving leave for medical appointments. Golat was not always happy with the accommodations offered, but there is no genuine dispute that the accommodations were reasonable. The court will grant summary judgment to defendants on the failure-to-accommodate claims.

### 3. Retaliation

Golat contends that she was retaliated against in violation of Title VII, § 1983, and the Rehabilitation Act for complaining about the harassment she experienced and for requesting disability accommodations.

As an initial matter, defendants contend that Golat did not exhaust her administrative remedies for her disability retaliation claim under the Rehabilitation Act; they also say that she forfeited that claim by not pleading it in her second amended complaint. The court disagrees. Golat's 2023 EEOC charge included an allegation that she had been retaliated against for protected activity under the ADA, which is sufficient to put defendants on notice of a retaliation claim based on her request for disability accommodations. *See McHale v. McDonough*,

41 F.4th 866, 869–70 (7th Cir. 2022). And although defendants are correct that Golat did not include a retaliation claim under the Rehabilitation Act in her second amended complaint, plaintiffs are not required to plead specific legal theories in their complaints. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015). Golat alleged in her complaint that she had requested and not received disability accommodations and that defendants had retaliated against her, which is sufficient to give defendants notice of a potential retaliation claim based on her accommodation requests. The court will consider Golat's Rehabilitation Act retaliation claim on the merits.

To establish her retaliation claims, Golat must prove: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 387 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). There's no dispute on the first element: Golat engaged in protected conduct. But to survive defendants' motion for summary judgment, Golat must adduce admissible evidence to create a genuine dispute on the second and third elements.

Golat identifies at least nine adverse actions in her briefs. She says that defendants:

1. forced her to move offices;

2. threatened her with discipline for failing to complete transcript requests on time;

3. audited her travel reimbursement requests and threatened discipline;

4. accused her of reporting unauthorized overtime hours;

5. placed her on unpaid administrative leave for a week as a punishment for mishandling a vacuum delivery and lying during the investigation into the missing vacuum;

6. investigated her for contacting the family of the victims in a pending homicide case before her judge;

7. investigated her for accepting salon credits as payment for transcripts.

18

8. issued her a formal reprimand for the salon credit and homicide victims incidents; and

9. declined to rehire her after Anderson retired.

Most of these incidents are not sufficiently serious on their own to support retaliation claims. An adverse action must be "material," meaning that it would dissuade an ordinary employee from complaining about discrimination. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 348 (2024) (retaliation claims require showing of materiality, but discrimination claims do not). Investigations, mere threats of discipline, or minor changes in workplace conditions are not materially adverse actions. *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016); *Lewis v. Wilkie*, 909 F.3d 858, 868–69 (7th Cir. 2018). In this case, Golat's office move, the investigations, and the threats of discipline against her that did not actually materialize, all fail to support retaliation claims on their own. But these types of actions may still be relevant as "evidence of retaliatory intent behind a more concrete adverse action." *Poullard*, 829 F.3d at 857.

Two of the events Golat identified are sufficiently material to support retaliation claims. First, in March 2022, defendants placed Golat on unpaid leave for a week as discipline for mishandling court property and for lying during the investigation into the missing vacuum. Defendants do not dispute that this was an adverse action. Second, Golat lost her job as a court reporter when Anderson retired in July 2022. Defendants argue that the job loss was not an adverse employment action because Golat was not terminated; her position simply ended as a natural consequence of Anderson's retirement. But that argument is unpersuasive. It is undisputed that when a judge retired, the judge's court reporter was typically re-hired by the new judge without having to apply. *See* Dkt. 145, ¶ 239. The court system's decision not to

follow the typical practice in Golat's case was an adverse employment action. *Cf. Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 436 (7th Cir. 2009) (when it is obvious that an adverse employment action occurred, courts should decide that issue as a matter of law).

The remaining disputed issue is causation; that is, whether Golat's "protected activity was a but-for cause of the alleged adverse action by the [defendant]." *Univ. of Texas Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 362 (2013). At summary judgment, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity . . . and the adverse action." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). Relevant circumstantial evidence of causation includes "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Id.*

### a. Suspension

Defendants' stated reason for Golat's weeklong suspension in March 2022 was that she had obstructed an investigation into a missing vacuum that belonged to the district attorney's office. The facts underlying this event are as follows: In December 2021, Golat accepted delivery of a vacuum and two other packages meant for the district attorney's office. Golat called the district attorney's office and someone came to pick up the other two packages, but did not pick up the vacuum. Golat removed the vacuum from its packaging and recycled the packaging. (In her deposition, Golat said that she did this was because the vacuum "fell out of the box," so she "assembled it and just left it right there [in the conference room]." Dkt. 99 (Golat Dep.) 214:23–25.) During a break in a video conference court hearing, Golat announced that the vacuum was in the conference room and that someone should come pick it up. Defendants say that no one heard this announcement.

20

The next day, Crystal Cleveland, a paralegal in the district attorney's office, realized that the vacuum was missing. Cleveland emailed courthouse employees to ask where the vacuum was, but received no response. (Golat was a recipient on this email, but says that she didn't see it.) Cleveland thought someone may have stolen the vacuum, so she notified police. Security footage showed Golat recycling the packaging, so police focused their investigation on Golat. Cleveland and the police also spoke with Anderson, who encouraged the investigation.

Three days later, staff found the vacuum in the conference room. Nevertheless, Anderson informed Channing and Bohse about the incident and Bohse initiated a human resources investigation. On March 18, 2022, Bohse issued Golat a formal disciplinary notice suspending her for one week without pay. Dkt. 94-16. Bohse found it "inconclusive" whether Golat had attempted to steal the vacuum, but noted that even if she hadn't, she had mishandled the vacuum by recycling the box, ignoring emails trying to locate it, and telling different staff members conflicting things about the delivery. *Id.*; *see also* Dkt. 94-20 (HR memo with investigation findings).

Golat says that the vacuum incident was mere pretext and that she was really suspended in retaliation for her accommodation requests and complaints of harassment. To show pretext, Golat must adduce evidence that defendants' reasons for disciplining her were lies. *Hudson v. Wal-Mart Stores*, Inc., 412 F.3d 781 (7th Cir. 2005). It does not matter whether the decisions the defendants made were accurate or fair, as long as they were honest. *Willis v. Marion Cnty. Auditor's Off.*, 118 F.3d 542, 548 (7th Cir. 1997). "Pretext can be shown by 'identif[ying] . . . weaknesses, implausibilities, inconsistencies, or contradictions' in an employer's asserted reason for taking an adverse employment action such 'that a reasonable person could find [it]

unworthy of credence.'" *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012) (alterations in original)).

Golat provides two reasons why a jury could infer pretext, neither of which the court finds persuasive. First, Golat says that Bohse's finding that she may have stolen the vacuum is plainly contradicted by the evidence. In an internal memo about the vacuum incident, Bohse wrote that according to security footage, Golat left work on December 27 "carrying a large duffle bag" and returning the next morning "carrying two large duffle bags." Dkt 94-20, at 4; *see also See* Dkt. 94-64 (December 27 security footage), at 23:51–24:02 and Dkt. 94-65 (December 28 security footage), at 42:05–42:47. Bohse concluded that Golat "could have left work with equipment in one of the large duffle bags she was carrying and returned with it the next day." *Id.* at 5. Golat says that it is obvious from the security footage that she was carrying only a laptop bag when she left work on December 27, making it entirely implausible that she could have removed a large upright vacuum from the building. But the security footage isn't as definitive as Golat suggests. Golat's bag is partially obscured by her body in the footage, so it's not obvious that the bag is too small to carry an upright vacuum. And in any event, defendants did not discipline Golat for actually stealing the vacuum. They disciplined her for not turning the vacuum over to the district attorney's office and for lying to staff about whether the vacuum had been delivered. Golat does not dispute defendants' factual findings on these points, nor does she provide any evidence that defendants' disciplinary decision was outside the norm for that type of misconduct.

Golat also argues that defendants responded unusually harshly to the vacuum incident because they could have just asked Golat where the vacuum was instead of accusing her of theft and calling the police. But it was paralegal Crystal Cleveland in the district attorney's office

who reported the vacuum incident to the police, not any of the defendants. Dkt. 94-22 (police report listing Crystal Cleveland as the complainant). Golat does not say that Cleveland had any knowledge of Golat's protected conduct, so her involvement in initiating the police investigation strongly undermines any assertion of pretext. *See Cygan v. Wisconsin Dep't of Corr.*, 388 F.3d 1092, 1103 (7th Cir. 2004).

Golat also argues that defendants had expressed retaliatory animus toward her. She relies mainly on a series of conversations between then-district court administrator Greg Moore, chief judge Maureen Boyle, Frederick, and Anderson, which occurred while Golat was on medical leave during the summer of 2019. In July and August of that year, Moore recorded the following notes during two conversations with Boyle:

> 7/25:
>
> - Shannon Golat on med leave. Some ?s about her med leave & work product. MB reporter says only book 1 day/week.
> - Thought SG [Shannon Golat] seeking more med leave or disability.
> - * - try to wrap up
> - Jdg SA [Steven Anderson] try to make harassment and physical disability.
> - Jdg SA has tolerated her non-sense.
> - About a yr ago Shannon staged a slip & fall in cthouse parking lot. Didn't seem injured. But Mgmt Serv got a claim.
> - SG is banned from Bayfield, Ba[unreadable], nasty, rude, and mean.
>
> 8/7:
>
> - Boyle fully supports separation. Dragged out way too long. Personally believed some fraudulent acts. Medical records seem to altered. Need to h[unreadable]
> - G [Gregg Moore] call Steve Anderson. MB [Maureen Boyle] thinks it's time to go. Prod
> - Bring Chris[topher Channing] up to speed.

Dkt. 94-31. Moore had a conference call with Anderson and Frederick around the same time. In a follow-up email to Boyle, Moore described that conference call as follows:

> [Anderson] and I had a conference call with Caitlin Frederick about Shannon Golat. Shannon said she's got medical OK to come back, but she says she needs off 3 half days every week for

> physical therapy. I told Judge Anderson that that doesn't work from my perspective. Judge is concerned he may be sued by Shannon if he[] terminates her; Caitlin is going to talk to DOJ. She'll get back to the judge and me. I've learned even more about Shannon and a[m] even more convinced she should be let go ASAP. I think the judge is leaning that way; he wants to wait until Caitlin gets back to us.

Dkt. 94-33. In late September of 2019, defendants decided not to terminate Golat. Moore wrote to Boyle: "I had a conference call yesterday morning with Judge Steve Anderson, [clerk of court] Lori Gorsegner and Caitlin Frederick regarding Shannon Golat. The consensus was to allow the situation to play out for a little bit longer." Dkt. 94-62.

Golat argues that these 2019 conversations demonstrate defendants' desire to terminate her because of her "non-sense" harassment complaints and because she was "seeking more med leave and disability." She says that these conversations were the start of a long-running scheme to justify her termination by falsely accusing her of misconduct.

No reasonable jury could credit Golat's theory that her suspension was part of a retaliatory scheme dating back to 2019. The 2019 conversations predate Golat's suspension by almost three years, so they are at most weak evidence of defendants' possible motive for the suspension. *See Smith v. Dunn*, 368 F.3d 705, 708–09 (7th Cir. 2004). Golat tries to connect the two events by arguing that the suspension was part of a pattern of investigations and disciplinary events, which also included accusations of not submitting transcripts on time, submitting erroneous mileage requests, and reporting unauthorized overtime. But Golat admits to much of the behavior that defendants accused her of (though not the erroneous mileage requests), which undercuts her assertion of a broader retaliatory scheme.

Golat's evidence of animus from 2019 also implicates different people than those who were involved in the decision to suspend her in 2022. A reasonable jury could infer from the

2019 conversations that Moore and Boyle held retaliatory animus against Golat, but neither of them were involved in the suspension decision. Frederick and Anderson were involved in some of the conversations in 2019 and were also involved in the suspension decision, but they did not make the comments about "non-sense" harassment complaints, "seeking more med leave or disability," or that Golat's request for leave to attend medical appointments "doesn't work from my perspective." And Bohse, who made the final recommendation to suspend Golat in 2022, was not even part of the alleged 2019 scheme.

Golat also argues that the timing of her suspension for the vacuum incident was suspicious. Golat filed an EEOC charge of harassment against Anderson in January 2022; the notice of charge was mailed to the Rusk County courthouse and to the Wisconsin Court System on March 9; and Frederick had a call with the EEOC about the notice of charge on March 15, three days before Bohse issued Golat her one-week suspension. "[T]iming evidence is rarely sufficient in and of itself to create a jury issue on causation." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 787 (7th Cir. 2005). And in this case, the timing evidence is weak. Defendants' investigation into the vacuum incident was mostly complete by the time they became aware of Golat's EEOC charge, so it is implausible that the investigation was pretext for retaliation.

Defendants have explained that they suspended Golat for her behavior during the vacuum incident. Golat does not substantively dispute the facts underlying the suspension and no reasonable jury could find that defendants' reason was pretext based on the evidence in the record. Defendants are entitled to summary judgment on the retaliation claim based on the suspension.

25

### b. Failure-to-hire

In March 2022, around the same time that they suspended Golat for the vacuum incident, defendants placed Golat on paid administrative leave while they investigated two other allegations of misconduct: (1) Golat's contacting Bridgette and Frank Rosolowski, the family of the victims in a pending homicide case before Anderson; and (2) Golat's accepting salon credits in exchange for transcripts. Defendants issued Golat a formal reprimand for these incidents in July, the same day Anderson retired. Anderson's replacement, former district attorney Annette Barna, subsequently declined to hire Golat, as did Judge Angeline Winton in the Washburn County circuit court. Channing spoke with both Barna and Winton about Golat before they decided not to hire her, and Bohse showed the judges Golat's personnel file, which included the reprimands she had received for the vacuum incident, the Rosolowski incident, the salon credits incident, and for allegedly misreporting her travel reimbursement requests, a reprimand that the court system had issued and then withdrawn a year earlier.

Golat does not contend that either judge who declined to hire her acted with retaliatory motive. Instead, she relies on a negative reference theory, asserting that defendants manufactured false misconduct allegations, put them in Golat's personnel file, and then gave the file to Barna and Winton, who might have hired her if not for the false allegations.[3] Dkt. 104, at 70 (citing *Szymanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006)).

---

[3] Negative reference cases generally involve former employees who are applying to positions at outside companies. *See, e.g., Szymanski*, 468 F.3d 1027. Golat was applying internally, so it may be more appropriate to view her allegations under a "cat's paw" theory of retaliation, in which the retaliatory motive of a subordinate infects an unbiased decision-maker. *Johnson v. Accenture LLP*, 142 F.4th 536, 544 (7th Cir. 2025). But using a cat's paw theory instead of a negative reference theory would not materially change the court's analysis. Golat uses a negative reference theory in her briefs, so the court will do the same.

Golat's retaliatory reference claim fails because no reasonable jury could find that Barna or Winton declined to hire her because of false information defendants had placed in her personnel file. Golat says that the file included false information related to the vacuum incident and her travel reimbursement requests. But she admits to the most serious allegations of misconduct in her personnel file, specifically that she called the Rosolowskis even though they were involved in a pending homicide case before her judge, and that she accepted salon credits in exchange for transcripts. She disputes some of the details of these incidents; in particular, she says that she did not offer Bridgette Rosolowski a secret recording of Anderson, but simply asked Bridgette to serve as a witness in her EEOC harassment case against him. But she doesn't explain why that matters. Regardless of why she called Bridgette, her actions interfered with a major pending case and led to Anderson having to recuse himself. Golat has no evidence that judges hired other court reporters accused of similar misconduct. Without some evidence that these actions were not disqualifying, no reasonable jury could infer that Barna or Winton's decision not to hire her was the result of anything other than Golat's admitted misconduct.

## B.  Remaining issues

The court is granting summary judgment to defendants on all of Golat's claims. Accordingly, defendants' motion to compel and for sanctions, Dkt. 105, is denied as moot.

One issue remains. In August, the magistrate judge denied Golat's motion to compel production of certain documents listed on defendants' privilege log because Golat's counsel had not engaged in a good-faith effort to meet and confer with defendants' counsel prior to filing the motion. Dkt. 177. The magistrate judge also awarded defendants $3,800 in fees under Federal Rule of Civil Procedure 37(a)(5)(B). Dkt. 180 and Dkt. 194. Golat now appeals the

magistrate judge's decision under Rule 72(a), which requires this court to "modify or set aside any part of [the magistrate judge's] order that is clearly erroneous or is contrary to law."[4]

Rule 37(a)(5)(B) provides that when a motion to compel is denied, the court "must . . . require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." Golat contends that the fee award in this case was improper for three reasons: (1) Rule 37(a)(5)(B) does not apply, because Golat's motion led defendants to produce additional discovery; (2) Golat's motion to compel was substantially justified; and (3) other circumstances make a fee award unjust.

Golat first argues that the magistrate judge should have analyzed fees under Rule 37(a)(5)(A), which applies when a motion to compel is granted "or discovery is provided after filing," instead of under Rule 37(a)(5)(B), which applies when a motion to compel is denied. Golat says that Rule 37(a)(5)(A) applies because a week after she filed her motion to compel, defendants produced 188 documents that had previously been marked as privileged. But defendants' additional production did not moot the motion to compel, nor did the magistrate judge grant any part of the motion; she denied the motion in full because plaintiff's counsel had not made sufficient efforts to meet and confer with defense counsel before filing the motion. The magistrate judge did not err in applying Rule 37(a)(5)(B) in assessing fees.

---

[4] Golat moved for leave to submit a reply brief in support of her motion. Dkt. 202. The court had already granted Golat leave to reply, so the motion for leave will be denied as unnecessary.

Golat's second and third arguments are essentially the same, so the court will address them together. Golat says that her motion to compel was substantially justified and that a fee award would be unjust because defendants engaged in evasive tactics to delay scheduling a conferral meeting. She argues that the magistrate judge failed to consider defendants' evasion when she determined that Golat had failed to engage in a good-faith effort to meet and confer prior to filing the motion to compel.

The magistrate judge's determination that Golat had failed to meet-and-confer was not clearly erroneous. Golat's counsel first contacted defendant's counsel about the privilege log issue on July 23, 2025. Dkt. 177, at 4. On July 25, defendants' counsel responded that her team had "limited availability next week due to other deadlines or planned vacations" but "we will do our best to get you a response in the next week." Dkt. 169-1, at 2. Golat's counsel responded that same day and did not object to the proposed timeline. Dkt. 173-1, at 1. On July 28, Golat's counsel followed up, asking defendants' counsel to "[p]lease let me know when you are available this week." Defendants' counsel did not immediately respond, so on July 30, Golat filed the motion to compel. Defendants had represented to Golat that they would do their best to get her a response "in the next week;" Golat had not objected; and that deadline had not yet passed when Golat filed the motion to compel. The magistrate judge found that Golat's counsel failed to "allow[] the meet-and-confer process to play out." Dkt. 177, at 5. That finding was not clearly erroneous in light of Golat's filing the motion to compel before the agreed-upon deadline for response had elapsed.

Golat argues that defendants' explanation about other deadlines and vacations was a bad-faith delay tactic, that there was no agreement between the parties on timeline, and that defendants' self-imposed deadline was unreasonable given that discovery closed on August 1.

None of these are a reason to set aside the magistrate judge's order. Golat's counsel did not object when defendants' counsel said, "we will do our best to get you a response in the next week," so based on the parties' communications, defendants' counsel would have had no reason to assume that Golat was demanding a response sooner than that. Nor does the impending close of discovery compel a different conclusion. As the magistrate judge noted, defendants served their privilege log on Golat in October 2024. Golat provides no reason why she could not have raised this issue with defendants' counsel months earlier.

One final issue. In her brief, Golat says that she is not sure whether the fee was assessed against her or her counsel, but that she assumes it was assessed against counsel. Golat is correct that the magistrate judge's order does not spell out who is required to pay the fee. The court agrees with Golat's assumption that the fee was assessed against counsel, so the magistrate judge's order will be affirmed with the clarification that Golat's counsel must pay the $3,800 fee.

CONCLUSION

Defendants have prevailed on the merits, but they cannot be proud of the level of professionalism in Judge Anderson's chambers and displayed by some of the staff and the bar of the Rusk County Circuit Court. Unfortunately, the lack of professionalism carried over to the litigation of this case. Plaintiff's counsel was the worse offender, but a case doesn't go this far off the rails without contributions from both sides. Counsel have ill-served their clients and the court and tarnished their professional reputations. The court hopes that counsel for both sides will engage in honest self-reflection about how this case became so acrimonious, so that they might avoid repeating their costly mistakes.

ORDER

IT IS ORDERED that:

1. Defendants Wisconsin State Court System, Christopher Channing, Caitlin Frederick, Melissa Bohse, and Steven Anderson's motion for summary judgment, Dkt. 119, is GRANTED.

2. Plaintiff Shannon Golat's motion for summary judgment, Dkt. 89, is DENIED.

3. Defendants' motion to compel and for sanctions, Dkt. 105, is DENIED as moot.

4. Defendants' motion to strike the affidavit of Rhonda Kelley, Dkt. 120, is DENIED as moot.

5. Golat's appeal of the magistrate judge's order assessing fees for Golat's unsuccessful motion to compel, Dkt. 197, is DENIED. The magistrate judge's order, Dkt. 194, is AFFIRMED with the clarification that the $3,800 fee is assessed against Golat's counsel.

6. Golat's motion for leave to file a reply brief, Dkt. 202, is DENIED as unnecessary.

7. The clerk of court is directed to enter summary judgment for the defendants and close this case.

Entered November 3, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge